# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Morton Denlow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 584 | **DATE** | 8/25/2004 |
| **CASE TITLE** | Ryan vs. Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order denying plaintiff's motion for summary judgment [20-1] and granting the Commissioner's motion for summary judgment [22-1]. The ALJ's decision not to award Claimant disability insurance benefits based on the alleged onset date of 11/1/94 and expiration of insured status on 6/30/97 is affirmed.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | AUG 27 2004 | | |
| ✓ | Docketing to mail notices. | date docketed | | |
| ✓ | Mail AO 450 form. | | | 26 |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT | docketing deputy initials | |
| yp | courtroom deputy's initials | 2004 AUG 26 PM 2:12 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

STEPHANIE RYAN,                    )
                                   )
        Plaintiff,                 )        Case No. 04 C 0584
                                   )
        v.                         )        Magistrate Judge Morton Denlow
                                   )
JO ANNE B. BARNHART,               )
Commissioner of Social Security,   )
                                   )                      DOCKETED
        Defendant.                 )                    AUG 2 7 2004



## MEMORANDUM OPINION AND ORDER

Plaintiff Stephanie Ryan ("Claimant") seeks judicial review of the decision of Defendant Jo Anne B. Barnhart, the Commissioner of Social Security ("Commissioner"), which denied Claimant's application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42 U.S.C. §§ 416(i), 423. This case is before this Court on cross motions for summary judgment. Claimant contends (1) that legal error was committed because the record was not fully and fairly developed; and (2) that the Commissioner's decision is not based on substantial evidence. This Court holds that the Commissioner adequately developed the record and that the decision was based on substantial evidence. Therefore, this Court affirms the Commissioner's decision.

## I. BACKGROUND FACTS

### A.    PROCEDURAL HISTORY

On December 7, 2001, Claimant applied for Disability Insurance Benefits ("DIB") pursuant to Title II of the SSA, alleging a disability effective November 1, 1994, R. 62-64,

due to severe diabetes, heel spurs, sub-locking in her right shoulder, and carpal tunnel syndrome in both wrists, R. 52, 76. Her application was denied initially and upon reconsideration. R. 49-53, 55. Claimant subsequently attended a hearing on October 4, 2002 before Administrative Law Judge ("ALJ") James A. Horn, R. 25, who ultimately determined that Claimant was not disabled prior to June 30, 1997, the expiration date of her insured status, because she could perform her past work as a hand packer, R. 14-17.[1] The Appeals Council denied Claimant's request for review, making the ALJ's decision the final decision of the Commissioner. R. 4-9. On January 26, 2004, Claimant filed a complaint in district court pursuant to 42 U.S.C. § 405(g).

**B.     HEARING TESTIMONY**

The testimony presented at the October 4, 2002 hearing before ALJ Horn included the testimony of Claimant and her husband. Claimant appeared *pro se* at the hearing. R. 27. She informed the ALJ that she understood her right to be represented by counsel and stated that she unsuccessfully had attempted to contact an attorney. *Id.* Claimant did not desire more time to acquire representation. *Id.*

**1.**

---

[1] In order to be entitled to DIB, an individual must establish disability while insured for benefits. *See* 42 U.S.C. §§ 423(a)(1)(A), (c)(1); 20 C.F.R. § 404.131; *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997). Moreover, benefits may be paid for only twelve months immediately before the application was filed. *See* 20 C.F.R. § 404.621(a)(1). Therefore, even if Plaintiff was disabled beginning on or before June 30, 1997, she would be required to show continuous disability from June 30, 1997 until November 2000, 12 months prior to filing her application.

## 2. Claimant's Testimony

Claimant has a history of diabetes mellitus beginning in 1978. R. 148. She has a high school education, is married with one daughter, and was thirty-five years old at the time of the hearing. R. 29. Claimant has worked as a hand packer, a cashier, and a tool trailer attendant. R. 85.

Between September 1986 and March 1990, Claimant worked as a hand packer at a factory. *Id.* Her duties included packing, taping, and stacking hair products, as well as frequently lifting cases of hair spray weighing approximately seven pounds. R. 32-33, 77. Her job required her to stand, to occasionally run a box-making machine, to walk for one hour, to stand for six hours, to climb for a quarter of an hour, and to crouch for a half hour. R. 32, 86. Additionally, she handled, grabbed, or grasped objects for a period of eight to ten hours, lifted up to twenty pounds occasionally and ten pounds more frequently. R. 86.

On June 13, 1989, Claimant injured both of her wrists while using the box-making machine. R. 164. As a result, Claimant experienced tingling, numbness, and pain in both of her hands and wrists, causing her painful and restless nights. *Id.* She received emergency treatment at Morris Hospital, R. 204, and ongoing treatment from a Dr. Tsai, who used MRIs, EMGs, and steroids to diagnose and treat Claimant from August 1989 to March 1990, R. 163, 166-67. Between May and November 1990, Claimant sought treatment for both wrists at Westlake Community Hospital, where she complained of stiff and painful wrists. R. 215-21. On August 2, 1990, a bone scan indicated normal results. R. 219. By November 15, 1990,

Claimant reported that her left wrist felt better but that pain persisted in her right wrist. R. 222.

After receiving treatment for her wrist, Claimant worked as a cashier and as a stocker for a gas station from April 27, 1991 until February 1992. R. 31. While working at the gas station, Claimant lifted two to three cases of beer at a time in order to stock the coolers. R. 32. This was her last significant full-time job. *Id.* During one or two months in 1993 and one or two months in 1994, Claimant worked temporarily for a contractor at Mobil Oil distributing tools and materials from the back of a trailer. R. 29-30. Claimant last worked in 1994. R. 29.

Claimant claims that she could not work between 1994 and the expiration date of her insured status because of numbness in her extremities and her diabetic condition. R. 35, 37-38, 40. She could not stand for longer than an hour without her feet and legs going numb. R. 35, 37-38. During that same time period, she had problems with numbness in her hands and wrists so that she could not use a cash register, could not type, and could not write for a long period of time. R. 37, 40. Claimant, however, could change diapers and care for her daughter, but had to have help. R. 38.

Claimant also had problems with unstable blood sugar levels. R. 40. In fact, Claimant stated that she went to the emergency room when she almost went into a diabetic coma on two occasions between the alleged onset date and the date her insured status expired. *Id.* Claimant, however, did not produce medical records to support her claim that she had visited the emergency room multiple times during the relevant period. R. 37.

Claimant stated that in 1994 she should have been in the hospital to control her diabetes, *id.*, but instead she received outpatient treatment for insurance reasons, R. 40-41. At that time, her insulin shots were increased from three to four per day. R. 42. Additionally, she increased the number of times she checked her blood sugar level from three to four times per day. *Id.* Claimant testified that besides the emergency room visits, she was never hospitalized during the relevant period. R. 36-37. Finally, besides diabetes and numbness, she experienced no other limitations between 1994 and 1998. R. 40.

Claimant's diabetes problems since the expiration date of her insured status were basically the same as they were before that date, but her problems may have gotten a bit worse by the time of the hearing. R. 36. At the time of the hearing, she was taking insulin shots and checking her blood sugar level at least four times a day. R. 41-42. Every time she leaves her home she checks her blood sugar level. R. 44.

Claimant has improved since she ceased working and her blood sugar levels are significantly better. R. 42. She had looked for jobs "in her town," but she can not find any work for which she is qualified and that would accommodate her disabilities. R. 36.

### 3.      Francis E. Ryan III – Claimant's Husband

Claimant's husband, Francis E. Ryan III, testified that before leaving for work each day he wakes Claimant and makes sure that she is alert. R. 43. At work, he calls her immediately upon arrival at the office and periodically throughout the day. *Id.* Claimant's husband stated that any variance in physical activity causes Claimant's blood sugar level to

go down, making her incoherent. *Id.* Consequently, Claimant can not drive long distances. Additionally, it is hard for her to find work because her employer would have to allow her to check her blood sugar level and to take her meals at exactly the same time every day. R. 43-44.

## C. MEDICAL EVIDENCE

### 1. Treating Physicians

On December 12, 2001, Claimant completed a Social Security Disability Report. R. 75-84. In Section 4 of the report, Claimant listed the doctors who had treated her. She named Dr. Richard Phelps, Dr. Raymond Meyer, and Dr. Thomas Rappette. R. 78-79. Instructions on the report state that additional space is provided in Section 9 to list other doctors. R. 79. Claimant did not identify any other doctors in Section 9. R. 83. However, on another social security form, Claimant identified Dr. Paul Bishop as a treating physician. R. 100-01.

### a. Dr. Richard Phelps

Dr. Richard Phelps specializes in internal medicine and endocrinology. R. 135. He treated Claimant primarily for diabetes both before and after her alleged disability onset date.

#### Evaluations Prior to the Alleged Disability Onset Date

Claimant first visited Dr. Phelps on January 25, 1991. R. 148. On that date, Claimant's glucose level was nearly twice the high-normal range. R. 161. By July 29, 1991, a custom profile of Claimant's fasting glucose revealed that her levels were within a normal

range. R. 160. At that time, Claimant generally felt well, though she was tired in the morning and restless in the evening. R. 149.

On January 19, 1993, after the birth of her daughter, Claimant returned to Dr. Phelps and was doing well. R. 150. She had responded well to her medications with no severe side effects. *Id.* Her vision, feet, legs, and sleeping patterns were all fine. *Id.* However, Claimant's blood test revealed that her glucose level was nearly three times the normal level. R. 159.

By the end of the year, on December 6, 1993, Claimant's glucose level remained three times higher than the high-normal range. R. 157. At that time, however, Dr. Phelps reported that Claimant was "doing OK." R. 151. Additionally, Dr. Phelps indicated that Claimant had no problems with her feet, legs, vision, or anything else. *Id.* Dr. Phelps placed Claimant on a schedule for annual exams. *Id.*

## Evaluations After the Alleged Disability Onset Date

When Claimant returned to Dr. Phelps on December 19, 1995, she had not seen Dr. Phelps for two years. R. 152. During that two-year period, Claimant had stopped taking two insulin injections for a while, but she recently had started taking them again. *Id.* Claimant had felt well and had no problems with her feet or legs. *Id.* Although Claimant had decreased sensation to vibration in her feet, she had normal sensation to light touch. R. 153. A lab test revealed high glucose levels, high triglycerides, high red blood counts, and low white blood counts. R. 154.

On February 21, 2002, Claimant had high glucose levels, R. 140, and Dr. Phelps completed a report for the Bureau of Disability Determination Services, indicating that Claimant had diabetes mellitus Type 1, from which she had been suffering since the age of seven, R. 123-24. Dr. Phelps noted that Claimant's compliance with therapy was good and that she currently had background retinopathy, sensory polyneuropathy in her feet, a decreased range of motion in her right shoulder with near dislocation "several times," and heel spurs in her right heel. R. 123. Dr. Phelps opined that Claimant's ability to walk and to stand for prolonged periods of time was "near impossible." *Id.*

On March 22, 2002, Dr. Phelps completed a Peripheral Vascular Report, indicating that Claimant suffered from plantar fascitis and that she should wear orthotics to reduce the pain. R. 125-26. Claimant was having pain in her feet when she saw Dr. Phelps on June 24, 2002, so he gave her a cortisone injection, which provided temporary relief. R. 137. Although Claimant's blood sugar levels were stable, *id.*, lab results from that day indicated Claimant had low glucose levels, R. 138.

**b.    Dr. Raymond Meyer**

Claimant stated that she was treated by Dr. Raymond Meyer for a dislocated shoulder on June 29, 2001, and an ankle injury in July 2002. R. 34-35. Claimant's ankle injury resulted from low blood sugar that caused her to collapse and to fall down stairs. R. 35.

### c.   Dr. Thomas Rappette

On January 23, 2002, podiatrist Dr. Thomas Rappette wrote a letter to the Office of Rehabilitation Services noting that he had seen Claimant on August 28, 2000 and that her left heel had pain and verruca plantaris. R. 122. He had removed the verruca lesion and treated the plantar fascitis with anti-inflammatories, physical therapy, and custom prescription orthotics. *Id.*

At a visit on November 20, 2000, Claimant's heel pain was ninety-five percent improved. *Id.* Dr. Rappette opined that he would have to reevaluate Claimant before determining the extent of any disability in 2002 because he had not seen her for two years, though Claimant likely did not have any current disability as a result of heel pain because she had not returned to see him since her November 20, 2000 visit, despite having been instructed to do so if she experienced any problems. *Id.*

### d.   Dr. Paul Bishop

On April 12, 2002, Claimant visited Dr. Paul Bishop for pain in her feet. R. 146. Dr. Bishop noted that Claimant still had pain in both heels, with her left foot more painful than her right foot. *Id.* Because of Claimant's unstable diabetes, Dr. Bishop decided to have Claimant continue using orthotics instead of receiving injections and began ultrasound and electrical stimulation therapy with some benefit. *Id.*

On May 1, 2002, Claimant visited Dr. Bishop for an electrical stimulation check. R. 145. Dr. Bishop noted that Claimant's heel had not been satisfactorily treated with orthotics,

9

ultrasounds, or electrical stimulation therapy and consequently injected it with steroids and a painkiller, which gave Claimant some relief upon standing. *Id.*

## 2. Evaluations by the Social Security Administration

On January 9, 2002, Dr. Paul E. Smalley, a non-examining state agency physician, performed a residual functional capacity assessment and opined that Claimant occasionally could lift twenty pounds, frequently could lift ten pounds, could stand or walk for a total of six hours in an eight-hour workday, and had an unlimited pushing and pulling ability. R. 128. Claimant could not climb ladders, ropes, and scaffolds, and her ability to reach in all directions was limited because of the recurrent dislocation of her right shoulder. *Id.* Dr. Smalley stated that this problem "will not particularly limit her ability to lift, but will significantly limit her ability to lift and then place any object above shoulder level." *Id.*

Also on January 9, 2002, Manju Jenveja, an employee of the Social Security Administration whose title and position are unknown, stated in a Report of Contact that although Claimant had the residual functional capacity to perform light work, she could not return to her past work. R. 93. However, Jenveja did cite to thousands of jobs in Illinois that satisfied the requirements of "light" work. *Id.*

## D. ALJ'S DECISION

On November 20, 2002, the ALJ issued an unfavorable decision denying Claimant's DIB. R. 11-17. The decision followed the five-step evaluation process provided in 20 C.F.R. § 404.1520. R. 16-22. The ALJ found that Claimant satisfied the first step because

she had not engaged in substantial gainful activity "at any material time." R. 14. At the second step, the ALJ found Claimant's diabetes to be a severe, medically determinable impairment. R. 15. Nevertheless, the ALJ stated that the third step was not satisfied because the impairment did not "meet or medically equal any of the listed impairments in Appendix 1, Subpart P, and Regulation No. 4." *Id.*

Pursuant to step four, the ALJ found that Claimant retains the residual functional capacity to perform light exertional level work existing in significant numbers in the national economy and that Claimant occasionally can lift or carry objects weighing up to twenty pounds and frequently can lift or carry objects weighing up to ten pounds. *Id.* Claimant's abilities to push or to pull are unlimited. *Id.* Finally, the ALJ found that Claimant can sit, stand, and walk for six hours in an eight hour workday. *Id.*

The ALJ supported his RFC determination with the medical treatment records from Dr. Phelps. *Id.* The records revealed that, besides diabetes, Claimant had no other serious ailments in the early 1990s. *See id.* Claimant generally felt well, her blood sugar levels were controlled with insulin, and she delivered a baby without serious complications. *See id.* The records also revealed an eight-month gap in treatment in 1993 and a two-year gap in treatment between 1993 and 1995. *Id.* The ALJ noted that Claimant had visited Dr. Phelps only five times between January 1991 and December 1995. *Id.* It was not until February 21, 2002 that Claimant began to complain to Dr. Phelps of swollen feet, which were treated with cortisone injections. R. 16. Given this evidence, the ALJ determined Claimant to have an

RFC value of light exertional work through Claimant's last insured date of June 30, 1997. *Id.*

To determine whether to reduce Claimant's RFC, the ALJ considered Claimant's testimony, which he found to be unconvincing. *Id.* The ALJ found that medical records from Dr. Phelps were inconsistent with Claimant's reported symptoms, that Claimant had visited Dr. Phelps only five times in the five year period between the end of 1990 and the end of 1995, and that the complaints and medical findings did not demonstrate a disabling condition. *Id.* The ALJ stated that Claimant's testimony concerning her functional limitations prior to July 1997 was not supported by any objective clinical findings, or by any other evidence of record when considered as a whole. *Id.*

Finally, the ALJ "was not convinced that what was disclosed as a present or recent medical situation could be related back to a point prior to July 1997." *Id.* Therefore, the ALJ determined that she was able to return to past work as a hand packer, which did not exceed the light exertional level of work. *Id.* Claimant thus was found not to be under a "disability" as defined by the SSA at any time through June 30, 1997. *Id.*

E.     **APPEALS COUNCIL DECISION**

On December 12, 2003, the Appeals Council denied Claimant's request for review. R. 4-9. The Council received additional evidence from Claimant, R. 8, and made it part of the record, R. 168-336. The evidence includes: (1) a 1997 diagnosis of background retinopathy and microaneurysms, R. 256; (2) a March 3, 2003 affidavit from Claimant,

claiming that there were so few recorded doctors visits between the alleged onset date and the expiration of her insured status because during that period she was seeing another doctor who had not retained her records, R. 168-74; (3) hospital records from March 1977 to March 1982, R. 177-99; (4) treatment notes by Dr. Phelps from February 19, 1995 to September 2002, R. 267-318; and (5) additional hospital records of blood tests and treatment for Claimant's wrists and feet, R. 319-24.

The Appeals Council considered the reasons Claimant disagreed with the ALJ's decision, as well as the additional evidence Claimant had submitted, but found that the information "does not provide a basis for changing the Administrative Law Judge's decision regarding the relevant period." R. 5.

## II. LEGAL STANDARDS

### A.    STANDARD OF REVIEW

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). An ALJ's decision becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Wolfe v. Shalala*, 997 F.2d 321, 322 (7th Cir. 1993). Under such circumstances, the decision reviewed by the district court is the decision of the ALJ. *Eads v. Sec'y of the Dep't of Health & Human Servs.*, 983 F.2d 815, 816 (7th Cir. 1993).

Judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching his decision and whether there is substantial evidence in the record to

support the findings. *Scivally v. Sullivan*, 96 F.2d 1070, 1075 (7th Cir. 1992). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). A mere scintilla of evidence is not enough. *Id.* Even if there is adequate evidence in the record to support the decision, the findings will not be upheld if "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it can not stand. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

A reviewing court must conduct a "critical review" of the evidence before affirming the Commissioner's decision, *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000), but does not re-evaluate the facts, re-weigh the evidence, or substitute its own judgment for that of the Social Security Administration, *Diaz*, 55 F.3d at 305-06. Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching a decision and whether there is substantial evidence to support the findings. *Id.*; *Scivally*, 966 F.2d at 1075. The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## B.     DISABILITY STANDARD

Disability insurance benefits are available to claimants who can establish "disability" under the terms of the Social Security Act. *Brewer v. Carter*, 103 F.3d 1384, 1390 (7th Cir. 1997). An individual is disabled if that individual has the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). However, a disabled individual is eligible for DIB only if that individual is under a disability. *Id.* § 423(a). An individual is under a disability if she is unable to do her previous work and can not, considering her age, education, and work experience, partake in any gainful employment that exists in the national economy. *Id.* § 423(d)(2)(A).

The Commissioner uses a five-step sequential process in order to determine if an individual is disabled. 20 C.F.R. § 404.1520(a). The sequential evaluation ends if, at any step of the process, the ALJ finds that the claimant is not disabled. *Id.* The ALJ must inquire: (1) whether the claimant is working in any substantial gainful activity; (2) whether the claimant's impairment is severe; (3) whether the impairment meets or equals a listed impairment in 20 C.F.R., pt. 404, subpt. P, App. 1; (4) whether the claimant is able to perform her past relevant work; and (5) whether the claimant's age, education, and past relevant work experience in reference to her residual functional capacity, enable her to do other work. *Id.* § 404.1520(a)(4)(i)-(v). In order to determine whether the claimant can

perform any past relevant work (step 4), the ALJ assesses the claimant's residual functional capacity ("RFC"). *Id.* § 404.1520(e). The RFC is defined as the most an individual can do after considering the effects of physical and mental limitations that affect her ability to perform work-related activities. *Id.* § 404.1545. The burden of proof is on the claimant through step four; the burden shifts to the Commissioner only at step five. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). At step five of the disability analysis, the Commissioner has the burden of proving that Plaintiff has the ability to engage in other work existing in significant numbers in the national economy. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

## C.   RIGHT TO COUNSEL BEFORE THE SOCIAL SECURITY ADMINISTRATION

A claimant has a statutory right to legal counsel at a disability hearing. 42 U.S.C. § 406(c); 20 C.F.R. § 416.1500; S.S.R. 79-19, at 257. A claimant may validly waive that right, provided the ALJ explains to the *pro se* claimant: "1) the manner in which an attorney can aid in the proceedings, 2) the possibility of free counsel or a contingency arrangement, and 3) the limitation on attorney's fees to 25 percent of past due benefits and required court approval of the fees." *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994).

## D.   ALJ'S DUTY TO ADEQUATELY DEVELOP THE HEARING RECORD

If the ALJ does not obtain a valid waiver, the burden shifts to the Commissioner to show that the ALJ adequately developed the hearing record. *Id.* Where the claimant appears *pro se*, the ALJ has a duty to "scrupulously and conscientiously probe into, inquire of, and

explore for all of the relevant facts." *Smith v. Sec'y of Health Educ. & Welfare*, 587 F.2d 857, 860 (7th Cir. 1978). This duty is met if the ALJ probes the claimant for possible disabilities and explores all relevant evidence. *Binion*, 13 F.3d at 245.

If the Commissioner can demonstrate that the record was fully and fairly developed, the claimant may rebut the showing with a showing either of prejudice or of an evidentiary gap. *Id.* However, a "significant omission is usually required before this court will find that the ALJ failed to assist *pro se* claimants in developing the record fairly." *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994). "In other words, the omission must be prejudicial." *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997).

## III. DISCUSSION

Claimant contends, and the Commissioner agrees, that the ALJ failed to obtain a proper waiver of Claimant's statutory right to representation because the ALJ did not disclose the contingency cap. Claimant, however, further contends that the ALJ did not fully and fairly develop the record and that the ALJ's decision was not based on substantial evidence. This Court will address each issue in turn.

## A. THE ALJ FULLY AND FAIRLY DEVELOPED THE RECORD AND CLAIMANT FAILED TO SHOW PREJUDICE

An invalid waiver of right to representation is not grounds alone to remand. *Binion*, 13 F.3d at 245. Therefore, this Court turns to whether the ALJ fully and fairly developed the hearing record and, if so, whether Claimant established prejudice to rebut this showing.

### 1. The ALJ fully and fairly developed the record

Claimant maintains that the ALJ failed to fully and fairly develop the record in several respects. First, Claimant maintains that the ALJ erred in failing to ask Claimant any direct questions about her residual functional capacity during the relevant time period. Pl. Br. at 20. Although the ALJ did not ask specific questions about each one of Claimant's limitations, the ALJ had ample evidence before him from which to make a determination about Claimant's physical capabilities during the relevant time period. For example, the ALJ asked Claimant why she felt she was unable to work beginning in 1994. R. 37-41. A reading of the record reveals that the ALJ gave Claimant ample opportunity to testify to her alleged physical limitations.

Second, Claimant argues that the ALJ failed to elicit all of the relevant medical evidence. *Id.* at 21. Specifically, Claimant points to missing medical records from a doctor whom she saw for her diabetes between 1993 and 1995, a January 1997 diagnosis of background retinopathy as well as uncorrected eyesight of 20/400, additional blood tests showing high glucose, hospital records pertaining to her wrist injury and a course of treatment for her feet and wrists, microaneurysms in her eyes in a November 1997 examination, and an affidavit by Claimant speaking to evidence that may have altered the outcome of her claim. *Id.* Claimant contends that the ALJ should have obtained this evidence, which she eventually submitted to the Appeals Council. *Id.* at 20. Moreover,

Claimant indicates that she was told not to obtain any medical records because the Social Security Administration would obtain them for her. *Id.* at 21.

The Court finds that the ALJ's actions in this case satisfied his duty to scrupulously and conscientiously probe into, inquire of, and explore all of the relevant facts for a *pro se* claimant. For example, Claimant was provided a disability report on which she had the opportunity to list who might "have medical records or other information about [her] illnesses, injuries, or conditions." R. 78. In response, Claimant listed three doctors and two hospitals. R. 78-80. Claimant does not contend that the ALJ failed to obtain records from these doctors and institutions. Furthermore, the ALJ asked Claimant at the hearing about the doctors from whom he had medical records, and then he asked her whether there were any other doctors Claimant had seen in the past ten years. R. 34. Claimant responded with the name of one more doctor, and the ALJ inquired in detail about the dates and type of treatment sought from that doctor. R. 35.

Claimant's complaint is that the ALJ failed to obtain records from a doctor who had not retained them and who was not identified until Claimant's submission to the Appeals Council. The Court finds that this complaint lacks merit and that, even though Claimant was *pro se* at the hearing, she had the burden at that time to identify the doctors who had treated her for her condition once the ALJ, through direct questioning or through administrative forms, asks those questions that reasonably would elicit the information.

## 2. Claimant has failed to show prejudice to rebut the Commissioner's showing that the record was developed fully and fairly.

Claimant contends that the additional evidence she submitted to the Appeals Council might have changed the ALJ's decision. Pl. Br. at 21. Claimant contends that the ALJ's failure to elicit this evidence prejudiced his decision against her. *Id.* This Court, however, finds that there exists no significant omission in the record that gives rise to a conclusion that the ALJ failed to assist the *pro se* claimant in developing the record fully and fairly. *See Luna*, 22 F.3d at 692.

Although some of the medical evidence submitted to the Appeals Council was dated during the relevant time period between November 1, 1994 and June 30, 1997, the Appeals Council determined that none of the evidence provided a basis to alter the ALJ's decision. R. 4-5. This Court concurs with the Appeals Council and finds that this new information is largely irrelevant to the Commissioner's determination. Very few of the new "exhibits," or sets of medical records, pertain to portions of the relevant time period; most are dated well before the alleged onset date of November 1, 1994. For example, Claimant produced a "progress note" from March 14, 1988, indicating that she suffered from hives as an allergic reaction to a type of insulin. R. 212. Additionally, Claimant produced a May 3, 1990 hospital record that noted wrist pain. R. 215. Although these records demonstrate that Claimant has a history of medical problems pre-existing the onset date, they do not show, nor could they change the ALJ's determination, that Claimant's only severe impairment existing between the onset date and the expiration date for insurance benefits was diabetes.

Therefore, these records are not determinative of Claimant's limitations between November 1, 1994 and June 30, 1997, and do not constitute a prejudicial omission to the record.

In this case, the absence at the hearing of any of the records submitted to the Appeals Council neither prejudices Claimant nor constitutes a significant omission from the record. For example, Claimant submitted the results of additional blood tests administered during or relatively close to the relevant time period. R. 312-18. The blood tests show that Claimant suffers from severe diabetes, a determination already made by the ALJ. R. 15. However, these blood tests do not indicate any additional limitation on Claimant's ability to work. Therefore, this Court finds that Claimant has failed to demonstrate prejudice.

## B.   THE ALJ'S DECISION WAS BASED ON SUBSTANTIAL EVIDENCE

Claimant argues that the ALJ's determinations that Claimant's testimony was not credible, Pl. Resp. at 1, and that Claimant could return to her past work were not supported by substantial evidence, Pl. Br. at 22. This Court finds that the ALJ's credibility determination with regard to Claimant was not patently wrong. Furthermore, this Court finds that the ALJ's determination that Claimant was not disabled and could return to past work was supported by substantial evidence.

### 1.   The ALJ's credibility determination is not patently wrong.

In making his determination, the ALJ chose to discount the credibility of Claimant's testimony because he found it "unconvincing." R. 16. The Social Security regulations require the Commissioner to consider a claimant's statements about his or her symptoms and

how they affect the claimant's daily life and ability to work. 20 C.F.R. §§ 404.1529(a), 416.929(a). There is a two-part test for determining whether complaints of pain contribute to a finding of disability. First, the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the symptoms alleged. 20 C.F.R. §§ 404.1529(a)-(b), 416.929(a)-(b). Second, if the ALJ finds an impairment that reasonably could cause the symptoms alleged, he must consider the persistence and intensity of these symptoms. 20 C.F.R. §§ 404.1529(c), 416.929(c). However, neither the ALJ nor this Court must give "full credit to every statement of pain, and require a finding of disabled work." *Bucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996). A court will not set aside an ALJ's credibility determination unless it is "patently wrong." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).

In this case, Claimant attempts to establish a disability that creates eligibility for benefits using both her own testimony and objective medical evidence. The ALJ's decision indicates a finding that Claimant has a severe impairment, which does not meet or medically equal any of the listed impairments, and that Claimant maintained an RFC of light exertional work. R. 15. The ALJ found that Claimant's testimony was not "convincing evidence to reduce the residual functional capacity," reasoning that Claimant's reported symptoms were not consistent with the limitations indicated in the medical records from Dr. Phelps. *Id.*

In support of the ALJ's reasoning, the medical evidence indicates that Dr. Phelps treated Claimant for her diabetes before, after, and during the period from November 1, 1994

22

through June 30, 1997. Both before and during the relevant time period, the records indicate that although Claimant suffered from irregular blood sugar levels, generally she was well. For example, the records from September 6, 1993 indicate that Claimant herself reported being "okay" and that she was having no problems with her feet, legs, or vision, nor any other problems at that time. R. 151. Later, the December 19, 1995 medical records indicate that Claimant had not been seen for two years, that she had not been ill in the past two years, and that she had no problems with her feet or legs. R. 152. In fact, according to the medical evidence, Claimant did not have any problems at all with her feet, with standing, or with walking until February 21, 2002. R. 123. Finally, the ALJ pointed out that Claimant's alleged onset date did not correspond to a trip to her doctor for treatment. R. 16.

Claimant contends that her complaints about her symptoms potentially could change the ALJ's disability finding if the ALJ would change his unfavorable credibility determination, and the way to change his unfavorable credibility determination is to consider all of the evidence that was submitted to the Appeals Council. Even if Claimant's contention were true, Claimant has not fulfilled her burden of providing evidence to the ALJ when the ALJ's questions and forms reasonably elicit such information. In this case, the allegedly most important case-determinative information would come from the missing records from the still unidentified doctor who treated Claimant between 1993 and 1995. Claimant had ample opportunity to identify that doctor on the forms provided by the ALJ or during the hearing, but she failed to do so. Because there is no indication that the ALJ would not have

23

obtained the medical records from that doctor, assuming they existed at that time, or personally talked to that doctor had he been identified, the Court finds that it is Claimant's own inactions and not those of the ALJ that prejudiced Claimant.

## 2. The ALJ's determination that Claimant was not disabled is supported by substantial evidence

As previously stated, the ALJ gathered sufficient testimony from Claimant regarding her physical limitations between November 1, 1994, and June 30, 1997. In her disability report, Claimant also indicated her limitations and the reasons she was unable to work. R. 76. Additionally, Dr. Smalley completed an RFC evaluation of Claimant's physical limitations as of 2002, R. 127-34, and social security employee Manju Jenveja concluded that although Claimant could not currently return to her past work as a hand packer, she could perform light work, R. 93. Jenveja indicated several types of jobs that fell within that category and noted the abundance of these jobs in the national economy. *Id.*

At the hearing, Claimant represented that her medical condition was approximately the same, though possibly slightly worse in 2002 than it was between 1994 and 1998. R. 39. Therefore, although Dr. Smalley's RFC evaluation and Jenveja's "report of contact" directly address Claimant's condition in 2002, the ALJ reasonably may decide to consider both in his evaluation of Claimant's condition between November 1, 1994 and June 30, 1997. This Court finds that if the ALJ takes into account Claimant's testimony that her current state is substantially the same, if not slightly worse than during the relevant period, and that the medical evidence for the relevant period appears to contain few physical limitations, then the

24

ALJ's decision that Claimant can perform her past work as a hand packer is supported by substantial evidence.

Furthermore, even if she could not return to her past relevant work, she could still perform light work. R. 43. This Court finds that the ALJ's determination that Claimant is not disabled and could return to her past work is supported by substantial evidence.

## IV. CONCLUSION

For the reasons set forth in this opinion, **Plaintiff's motion for summary judgment is denied and the Commissioner's motion for summary judgment is granted.** The ALJ's decision not to award Claimant disability insurance benefits based on the alleged onset date of November 1, 1994 and expiration of insured status on June 30, 1997 is affirmed.

**SO ORDERED THIS 25th DAY OF AUGUST, 2004.**


_____
**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**


**Copies mailed to:**

Christopher S. Montgomery
HANSON & HANSON
ATTORNEYS AT LAW
1802 N. Division St., Suite 304
Morris, IL 60450

Counsel for Plaintiff

Shefali B. Baltz
SPECIAL ASSISTANT
UNITED STATES ATTORNEY
200 West Adams Street, 30th Floor
Chicago, IL 60606

Counsel for Defendant